**IN THE UNITIED STATES DISTRIC COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA     )
     )
     )
v.     )     **Criminal Number: 3:23CR150-REP**
     )
     )
**KUMKIO MARTIN,**     )
     **Defendant.**     )
     )

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE**
**DERIVED FROM THE FLOCK CAMERA SYSTEM**

Now comes the defendant, Kumkio Martin, by counsel, and submits this brief in support of his previously filed motion to suppress evidence derived from the Flock Safety surveillance camera system. Because the police search and use of images from the Flock camera system constituted an unconstitutional warrantless search in violation of the Fourth Amendment, Mr. Martin respectfully requests that the Court suppress the evidence derived from the search.

**I.     Relevant History**

Mr. Martin was indicted and charged with robbery, use of a firearm in the commission of the robbery, and possession of a firearm by a convicted felon. During the course of their investigation into the robbery, officers of the Richmond Police Department utilized a third party camera surveillance system developed by Flock Safety ("Flock"). Flock Safety has contracts with multiple law enforcement agencies including the Chesterfield Police Department and the City of Richmond Police Department.

Mr. Martin filed a motion to suppress the evidence obtained as a result of accessing the Flock camera system. The Court took evidence on Mr. Martin's motion over three days to

1

accommodate various witness schedules on July 3, July 16 and July 17, 2024.[1] Following the

presentation of evidence, the Court instructed each counsel to submit briefs in support of their

respective positions on the motion.

## II.    Relevant Facts

Prior to April 22, 2023, the Richmond Police Department purchased Flock Safety's

camera surveillance system. Flock Safety is a technology start-up company based out of Atlanta,

Georgia.[2] According to Flock representatives, their flagship product is called the Falcon and it is

capable of capturing license plate information.[3] As high-speed, high definition cameras, Flock

cameras are also capable of capturing the make of a car, its color, the GPS coordinates, any

visible damage on the car, the body style of the car, whether there are any external roof racks on

the car, or any bumper stickers or decals that may be on the car.[4] Flock makes constant, daily

updates to its camera systems allowing it to increase the characteristics captured by its systems.[5]

Flock cameras are also capable of capturing external surroundings in their images, including

other parked cars and even trash cans.[6]

By May 4, 2023, there were 188 Flock cameras in the metropolitan Richmond area.[7] This

area included the City of Richmond, Henrico County, Chesterfield County, Hanover County and

Colonial Heights. Several private entities also had Flock cameras installed including Western

Express Inc., Extended Stay America (ESA) Management, LLC, and the Hanover Chamber of

Commerce.[8] One of Flock's recommendations is to place the cameras along main thoroughfares

---

[1] The transcript for the July 3 hearing shall be referred to as "Transcript 1 at [page number]" or "Tr. 1 at __"; the hearing on July 16 shall be referenced as Transcript 2; the hearing on July 17 shall be referenced as Transcript 3.
[2] Tr. 3 at 4.
[3] Tr. 3 at 4-5.
[4] Tr. 3 at 28-29, and Tr. 2 at 10.
[5] Tr. 3 at 23.
[6] Tr. 1 at 12.
[7] Defendant's Exhibits 1 and 2.
[8] *Id.*

but they may also be located in "places of interest" or wherever else law enforcement requests the cameras be placed.[9] Places of interest may be areas of criminal activity, but may also include schools, community centers, retail centers, and neighborhoods.[10] With the appropriate agreements in place, law enforcement can access the images from any Flock camera, whether maintained by other law enforcement or private entities, anywhere in the country.[11]

On or about April 22, 2023, two individuals were robbed at gunpoint on the southside of Richmond. The suspect's vehicle was determined to be parked behind a nearby Valero gas station.[12] Richmond police were called to investigate the robbery. During the course of their investigation, the Police Department received a video and images of the suspect's vehicle from the Valero gas station with certain identifying stickers on the windows.[13] This video description of the vehicle also included the make and model of the suspect vehicle.[14] The police also received a general description of a black male wearing a mask as the primary suspect.

Based on the information from the Valero video, the police then accessed the Flock system to search for vehicles matching the description of their suspect vehicle. Police did not seek a warrant prior to searching the images on the Flock system.[15] They identified a vehicle belonging to Mr. Martin's then girlfriend and, in coordination with Chesterfield Police, secured a GPS search warrant for the vehicle which was installed on May 3, 2023.[16] On May 4, 2023, there wasa  robbery at a Tobacco Hut on Midlothian Turnpike. Richmond Police determined that the GPS-installed vehicle had been at the location during and prior to the robbery.[17] Richmond

---

[9] Tr. 3 at 34.
[10] *Id.* at 34-35.
[11] Tr. 3 at 29-31.
[12] Tr. 2 at 77.
[13] *Id.*
[14] Tr. at 82.
[15] Tr. at 91.
[16] Tr. 1 at 27.
[17] Tr. 2 at 80.

Police contacted Chesterfield Police as the suspect vehicle was located on Lamplighter Court in Chesterfield.[18] Chesterfield Police observed the vehicle and subsequently arrested Mr. Martin when they saw him later leave in the vehicle from his apartment.[19]

### III.    Applicable Court Precedents

#### A. *Carpenter v. United States*, 585 U.S. 296 (2018)

In *Carpenter*, the United States Supreme Court recognized that the Fourth Amendment protects not only a person's property interests but the Amendment protects certain expectations of privacy as well. *Carpenter*,  585 U.S. at 304. In *Carpenter*, the Court faced the question of how to apply the 4th Amendment to technology that allowed law enforcement to track a person's past movements through a record of his cell phone records.[20] The Court examined its own precedents applying the Fourth Amendment to emerging technologies and noted two key guideposts governing its prior opinions: (1) that the Amendment seeks "to secure "the privacies of life" against "arbitrary power", and (2) that one of the Framers' central aims was "to place obstacles in the way of a too permeating police surveillance."[21]

Timothy Carpenter was arrested along with several other individuals for allegedly robbing a series of stores in Detroit. One of the persons initially arrested provided law enforcement with several telephone numbers of some of his accomplices. Law enforcement then sought a court order under the Stored Communications Act for Carpenter's number and other numbers that the initial suspect was believed to have called at the time of the robberies. Two orders were issued by the federal magistrate allowing law enforcement to obtain data from Carpenter's cell phone providers which catalogued Carpenter's movements through 12,898

---

[18] Tr. 1 at 28-29.
[19] *Id.*
[20] *Carpenter*,  585 U.S. at 309.
[21] *Carpenter*,  585 U.S. at 305.

location points. Carpenter moved to suppress the information from the cell cite location information (CSLI) but his motion was denied. He was convicted at trial in large part because of the cell site information which placed his phone near several of the robberies. The Sixth Circuit Affirmed the decision of the district court and Carpenter appealed to the Supreme Court.

The Supreme Court held that an individual "maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI" and that the information obtained from the wireless providers was the product of a search.[22]

### B.  *Leaders of a Beautiful Struggle v. Balt. Police Dept.*, 2 F.4th 330 (2021)

Baltimore Police instituted a pilot program known as the Aerial Investigation Research (AIR) program which was an aerial surveillance program. The AIR program used airplanes to track movements related to serious crimes by flying distinct orbits above Baltimore and utilizing an advanced camera system.[23] The cameras were capable of capturing 32 square miles per image per second and, based on the flight schedule of the planes, obtained an estimated 12 hours of coverage of approximately 90% of Baltimore each day.[24] By agreement, image collection was limited to daylight hours.

Information from the AIR program was stored on the contractor's servers and retained for forty-five days. Although the AIR program was not designed to provide real-time analysis, evidence at the hearing determined that it was feasible.[25] Detailed reports on the data collected by the program were submitted to the Baltimore Police Department.

---

[22] *Carpenter*,  585 U.S. at 310.
[23] *Leaders*, 2 F.4th at 334.
[24] *Id.*
[25] *Id.*

A group of community advocates challenged the program and sought to enjoin its implementation. The injunction request was denied, the program began a week later, and the plaintiffs appealed to the 4th Circuit arguing that the AIR program violated *Carpenter*.

The 4th Circuit first reviewed *Carpenter*, specifically noting the Supreme Court's observation that society would not expect police to "secretly monitor and catalogue every single movement of an individual's car for a very long period."[26] The Court then found that *Carpenter* clearly controlled its case and reversed the lower court's decision finding that the AIR program allowed police to "deduce from the whole of individual's movements," and that accessing the data of the program was a search requiring a warrant.[27]

**C.  *United States v. Chatrie*, 2024 U.S. App. LEXIS 16692, No. 22-4489 (July 9, 2024)**

Recently, the 4th Circuit had another opportunity to apply *Carpenter's* rationale concerning expectations of privacy in *Chatrie*. Okello Chatrie was indicted on two felony counts related to armed robbery and use of a firearm in the commission of a crime of violence.[28] Chatrie filed a motion to suppress the evidence arguing that the geofence warrant used to procure location history data from his cell phone was secured in violation of the 4th Amendment. The district court denied his motion and Chatrie entered a conditional guilty plea. Chatrie then appealed to the 4th Circuit Court of Appeals.

The 4th Circuit affirmed the district court decision finding that Chatrie did not have a reasonable expectation of privacy in the two hours of location data because he had voluntarily exposed this information to Google.[29] The Court found that the voluntariness of Chatrie's exposure of information, the limited amount of information requested, and the nature of the

---

[26] *Leaders*, 2 F.4th at 341.
[27] *Id.* at 346.
[28] *United States v. Chatrie*, 2024 U.S. App. LEXIS 16692, No. 22-4489, *11-12.
[29] *United States v. Chatrie*, 2024 U.S. App. LEXIS 16692, No. 22-4489, *12.

6

information sought all favored a finding that Chatrie did not have a legitimate expectation of privacy in the location data and, therefore, the government did not conduct a search under the 4th Amendment when it accessed the location history data from Google.

### IV.    Argument

####    1.    Accessing the data from the Flock Camera System constituted a search under the Fourth Amendment and required a warrant

Mr. Martin asserts that the search of the Flock camera system by law enforcement constituted a search in violation of the 4th Amendment and *Carpenter*. In identifying a search, the 4th Circuit in *Leaders* wrote, referencing *Carpenter*, that "to identify a "search" we identify an invasion of a reasonable privacy expectation. To do that, we consider not only the raw data, but what that data can reveal." [30] In ruling on CSLI information in *Carpenter*, the Supreme Court held that when the government accessed the cell site information from the wireless carriers, the access to the information was an invasion of Carpenter's reasonable expectation of privacy in the whole of his movements.[31] Both courts examined the information that the CSLI and AIR systems could collect on individual movements in determining that a warrant was required. Analysis of the Flock camera system illustrates a similarly expansive body of historical information being maintained on individual movement.

Defense expert witness Lars Daniel testified regarding the capabilities of the Flock camera system.[32] Mr. Daniel specifically noted that the 188 cameras in the Richmond region were networked so that information could be shared with anyone who had access to the data. He further testified that these cameras, including the cameras which captured Mr. Martin driving the suspect vehicle, could display high speed, high resolution images that captured multiple

---

[30] *Id.* at 344.
[31] *Carpenter*,  585 U.S. at 313.
[32] Tr. 2 at 9-58.

characteristics about a vehicle. Among the details captured by Flock cameras are a vehicle's GPS location, make, model, color, body style, vehicle damage and any external racks. The data also includes the date and time a vehicle passed by a Flock camera. And unlike the limited collection hours of the AIR system in *Leaders*, the Flock cameras in this case operate 24 hours a day, 7 days a week.[33] By networking these cameras together, any vehicle passing a Flock camera could be tracked anywhere in the United States. While Flock's representative attempted to argue that such tracking was unlikely, he did not dispute that it could be done.[34]

As the number of cameras increases, law enforcement gains an even greater ability to access greater detail on a driver's movements. According to Richmond Police Lieutenant Castrinos, there are currently 97 Flock cameras operating in the City of Richmond.[35] That number represents an increase of 31 cameras from just the previous year.[36] Flock also has agreements with retail establishments in the metro Richmond area whose cameras may also be accessible to law enforcement by agreement. Just as with the AIR system in *Leaders*, Flock cameras effectively record the movement of all driver-operated vehicles in the Richmond region and maintain that information for at least 30 days.  It is this very type of detailed information gathering and maintenance for an extended period of time that led the courts in *Carpenter* and *Leaders* to determine that accessing third-party information constituted a search under the 4th Amendment. In *Carpenter*, anytime a person makes a call, their CSLI may be captured. Similarly, the networked Flock camera system captures a person's movements anytime they get in a car with the same ability to track that person's historical information as more cameras are added and there is increased sharing between law enforcement and private retailers.

---

[33] TR. 2 at 43.
[34] Tr. 3 at 31.
[35] Tr.1 at 41.
[36] Defendant's Exhibits 1 and 2.

8

Both *Carpenter* and *Leaders* make it clear that it is the *accessing of the data* that constitutes a search. The Flock camera system captures and retains not only Mr. Martin's movements, but every single person traveling within its national web of linked cameras. Mr. Martin had a reasonable expectation of privacy that the whole of his travel would not be monitored or tracked by the government. Accordingly, the search of the Flock system amounted to a search in violation of the 4th amendment.

**2.  Mr. Martin had a legitimate expectation of privacy in the whole of his physical movements even when traveling on public thoroughfares**

The government will likely rely on the fact that the Supreme Court has previously ruled that a person has no legitimate expectation of privacy in operating a vehicle on public roads.[37] And in the recent 4th Circuit decision of *Chatrie*, the Court affirmed the district court's denial of a motion to suppress alleging a violation of *Carpenter*. However, the government's reliance on these cases would be misplaced.

Chief Justice Roberts clearly noted in *Carpenter* that the type of "rudimentary tracking" described in *Knotts* may result in a different outcome if "twenty-four hour surveillance of any citizen of this country [were] possible."[38] Chief Justice Roberts also pointed out how the Court's previous opinion in *Jones* highlighted the fact that longer term GPS monitoring still impinges on expectations of privacy regardless whether an individual's movements were disclosed to the public at large.[39]To adopt the position that one merely waives all 4th Amendment protections when entering the public sphere ignores the balance the Court seeks to achieve in light of advancing technology.

---

[37] *See, United States v. Knotts*, 460 U.S. 276 (1983) (government's use of a tracking device to monitor a short trip did not constitute a search). *See, also, United States v. Jones,* 565 U.S. 400 (2012) (use of GPS device on vehicle amounted to a search).
[38] *Carpenter*,  585 U.S. at 307.
[39] *Carpenter*,  585 U.S. at 307.

In *Leaders*, the 4th Circuit observed that the key similarities between *Leaders* and the Supreme Court's precedent was the surveillance technology's ability to surpass ordinary expectations of law enforcement's capacity and the technology's ability to provide enough information to deduce details from the whole of a person's movements.[40] The use of these modern mass surveillance technologies far exceed what society would expect from law enforcement, allowing police to build an ever more detailed picture of the movements of individuals.

The court in *Chatrie* affirmed the denial of the motion to suppress by focusing heavily on the affirmative steps Chatrie had to take to give Google permission to track and store his location data unlike the parties in *Carpenter* or *Leaders* or the current case. The *Chatrie* court also noted the short duration of and extent of information requested regarding Chatrie's location history. The Court in *Chatrie* was not examining a camera system that captured data 24/7 and stored it for 30 days or more nor was the Court faced with an involuntary production of information to a third-party as in *Carpenter* and *Leaders*. Additionally, the *Chatrie* court did not have to deal with a system that connected third-party vendors, retailers and law enforcement entities to create a common picture of a vehicle's movements across a region or even further. Nor was the court faced with the ever growing number of surveillance cameras as evidenced in this case. There were 188 Flock cameras in the Richmond region one year ago. Now, that number exceeds 220 with just the addition of the new cameras in the City of Richmond. It is for this very reason, the 4th Amendment was intended to serve as an obstacle "in the way of a too permeating police surveillance."[41]

---

[40] *Leaders*, 2 F.4th at 343.
[41] *Carpenter*, 585 U.S. at 305.

10

Accordingly, the government's warrantless access of the Flock camera system violated Mr. Martin's 4th Amendment rights despite his operating a vehicle on a public thoroughfare.

### 3. There were no exigent circumstances that justified a warrantless search

The government did not present testimony suggesting any basis for a warrantless search and relies on its argument that no search occurred. Mr. Martin submits that not only were there no exigent circumstances justifying the search of the Flock data base, but he suggests that police had more than sufficient information to get a warrant had they chosen.

Prior to searching the Flock system, police had received a video showing the suspect car as a gold Acura with stickers located in conspicuous places on the rear windows.[42] Based on the video evidence, police also knew the location where the vehicle was parked, the location of Flock cameras in the area, potential routes of travel, and that the suspect was a black male. Yet, officers claimed that they did not have enough information for a search warrant.[43]

In *Chatrie*, officers initially had a similar lack of success in solving a robbery. Interviews of witnesses and reviewing the bank video footage failed to identify a suspect.[44] However, an officer noticed that the suspect in one of the images was carrying a phone. Based on that information and believing that location data would identify the suspect, the officer secured a geofence warrant prior to accessing location data information.[45]

"When examining a warrant application, a judicial officer must make a 'common-sense' determination whether the application shows a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019). In this instance, officers could have requested a warrant to access the Flock data system

---

[42] Tr. 3 at 82-83; Government's Exhibit 7 and Attachment A, Defendant's Motion to Suppress.
[43] Tr. 1 at 57.
[44] *United States v. Chatrie*, 2024 U.S. App. LEXIS 16692, No. 22-4489, *9.
[45] *Id.*

11

knowing that the suspect in the robbery drove a gold Acura with distinctive window stickers at a particular place and time in the City of Richmond. In the absence of exigent circumstances, a failure to do so amounted to a 4th Amendment violation.

## Conclusion

Mr. Martin had a reasonable expectation of privacy that the whole of his travel would not be monitored or tracked by the government. Because the government failed to get a warrant prior to accessing the data maintained by Flock, Mr. Martin requests that any evidence obtained as a result of the unconstitutional search should be suppressed.

Respectfully submitted,

KUMKIO MARTIN

/s/ Carlos L. Hopkins
By Counsel

Carlos L. Hopkins (VSB #39954)
Gentry Locke Attorneys
919 East Main Street, Suite 1130
Richmond, VA 23219
Tele:  (804) 297-3700
Fax:   (540) 983-9400

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2024, I electronically transmitted the foregoing document via the Court's ECF system, which provided service on all counsel of record.

/s/ Carlos L. Hopkins
By Counsel