IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA

v.                                                    Case No. 3:23-cr-150-REP

KUMKIO MARTIN,

*Defendant*.

**UNITED STATES'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL MOTION TO
SUPPRESS EVIDENCE DERIVED FROM THE FLOCK CAMERA SYSTEM**

Kumkio Martin is charged with Hobbs Act robbery, using a firearm during a crime of violence, and possession of a firearm as a convicted felon.  During their investigation into the robberies, the police used a database of images from cameras equipped with automated license plate recognition ("ALPR") technology to obtain the license plate number and photos of the getaway car.  Martin argues that the use of the ALPR database infringed upon his Fourth Amendment rights and asks the Court to suppress the evidence derived from this "search."

The Court should decline to do so.  Martin has not shown that he had a reasonable expectation of privacy.  There is no privacy interest in a car's license plate number or movements along public thoroughfares.  And Martin has neither alleged nor shown that the police used the ALPR database to track the totality of his movements for a sustained period of time.  Accordingly, using the database did not infringe upon any Fourth Amendment right.

Even if the Court disagrees, it should still deny the suppression motion.  The officers investigating the case gathered the evidence in good-faith reliance on binding appellate precedent and valid search warrants.

## BACKGROUND[1]

### I.    The April 2023 Robbery

On April 22, 2023, two victims were approached by a black male who robbed them at gunpoint in the area of Dunston Avenue in Richmond. Tr. 1 at 6-7; Tr. 2 at 77.[2] A nearby Valero gas station had security cameras that recorded the robbery. *Id.* The footage shows a four-door sedan backing into an alley beside the Valero. Tr. 1 at 7-8; Tr. 2 at 77; US Exhibit 4. Detective Eric Sandlin, with the Richmond Police Department, gathered the video footage and identified the suspect's car as a four-door with stickers on the two rear passenger windows. Tr. 1 at 9; Tr. 2 at 78. The footage did not show the car's license plate. Sandlin sent out a vehicle-of-interest flyer with a description and pictures of the car to local law enforcement personnel. *Id.*

After the Dunston Avenue robbery, Sergeant Castrinos gave pictures of the getaway car to Richard Redford, a Master Patrol Officer with the Richmond Police. Tr. 1 at 21. Redford used the Flock database to identify the car's license plate number. *See* Decl. of Officer Richard Redford, US Exhibit 3. He did so by running a search for all silver sedans in the Richmond area. The resulting search produced over 2,500 images. *Id.* Redford manually searched through these pictures for an Acura sedan with stickers on the rear passenger windows. *Id.* After several hours of searching, Redford identified a gold Acura with stickers on the rear passenger windows and a Virginia license plate number UAL-6525. *Id.*; *see* US Ex. 4.

The officers determined that the Acura was registered to Breona Reid, and that Reid lived at an apartment on Lamplighter Court in Chesterfield. Tr. 2 at 79; US Exhibit 7. On the day of

---

[1]    The United States incorporates its statement of "Background" from its original brief. ECF 22.

[2]    Transcript 1 refers to the transcript of the hearing on July 3, 2024. Transcript 2 refers to the transcript of the hearing on July 16, 2024. Transcript 3 refers to the transcript of the hearing on July 17, 2024.

the Dunston Avenue robbery, a Flock camera at the intersection of Stella Road and Lamplighter Court took pictures of the Acura at 6:21 am and again at 8:44 am, 17 minutes after the police received a call about the robbery.  Reid's address on Lamplighter Court is roughly 13 minutes (6.8 miles) away from the Valero on Dunston Avenue.  Based on this investigation and the information provided by the victims, Detective Sandlin applied for a warrant to place a GPS tracking device on the Acura.  *Id.*  A magistrate issued the warrant on April 26, and Chesterfield detectives covertly placed a GPS tracker on the car on May 3. US Exhibit 7; Tr. 1 at 26-27; Tr. 2 at 80.

## II.     The Tobacco Hut Robbery, Martin's Confession, and the Lamplighter Court Evidence

The next morning, a robber stole money and vaping products from a Tobacco Hut on Midlothian Turnpike in Richmond.  After speaking with the victims, the police determined that the vehicle on which they placed the GPS tracker the day before had been at the location of the Tobacco Hut Robbery during the time of the robbery.  Tr. 1 at 28; Tr. 2 at 80-81.  They determined that the car left the Tobacco Hut after the robbery and returned to the Lamplighter Court apartment. Tr. 2 at 81.  Detectives from Chesterfield County began surveilling the Acura at the Lamplighter Court apartment.  Tr. 1 at 29.  They saw the driver of the Acura, a man matching the description of the robber, enter the Lamplighter Court apartment for a few minutes, exit, and return to the Acura.  *Id.*  As the car drove off, Chesterfield County officers conducted a felony traffic stop.  *Id.* The officers identified the Acura's driver as Kumkio Martin.

Martin was transported to Richmond Police Department's Third Precinct station.  At the station, Martin was interviewed.  Based on information from the defendant's interview, law enforcement procured a search warrant for the defendant's residence.  US Exhibit 8.  Evidence relative to the Tobacco Hut robbery was found at that location at the defendant's direction.  Tr. 1 at 30.

### III.    The Flock Camera System

Martin argues that the use of the Flock database to identify the Acura's license plate violated his Fourth Amendment rights.  He asks the Court to suppress any evidence derived from the use of the database.

The Flock camera system in this case is a product called the Falcon, which is a stationary camera which is placed upon a pole at a right-of-way or intersection with the aim of capturing the rear license plate of vehicle passing the camera.  Tr. 3 at 4-5.  The camera is triggered by motion detection and it captures an image which depicts features which would be visible to someone standing on the street observing the vehicle.  Tr. at 5.  This includes the color of the vehicle, the make of the vehicle, the alphanumeric symbols on the license plate of the vehicle, and the state of the license plate on the vehicle.  *Id.*   The camera then stores the images in a secure cloud.  *Id.*

During an active investigation, such as the one in this case, an investigator may then perform a search of the stored images.  Tr. 3 at 7.  Again, the search parameters cover vehicle characteristics that would be visible to the naked eye of a witness "would typically describe to an officer if [he was] at the scene of a crime."  Tr. 3 at 8.  Those parameters include license plate, state of the license plate, body type, such as SUV or sedan, make of the vehicle, color of the vehicle, and special vehicle characteristics, such as roof racks, stickers, and toolboxes.  Tr. 3 at 8-9.  Those are the six areas parameters currently searchable by an investigator.  Tr. 3 at 9, 23-24.

Considering the cameras are stationary, the cameras "do not have any pan, tilt, [nor] zoom capabilities."  Tr. 3 at 10.  Consequently, the camera has no ability to track any vehicle from one location to another.  In other words, "the camera itself is not moving and the cameras are affixed in one location and are capturing vehicles and their license plates in a single point of time at one geolocation."  Tr. 3 at 10, 25-28.  The cameras do not depict images of any driver or passenger of

4

the vehicles, nor does the Flock database link to any registration data for the vehicle. *Id.*[3] Instead, an investigator would have to do additional police work to find more information about the vehicle, such as its owner, the address associated with the vehicle, and any passengers in the vehicle apart from the information gleaned from the Flock cameras. Tr. 3 at 10-11; see US Exhibit 4.

With respect to placement of the cameras, Flock works with its customers to determine the best locations of the cameras. Tr. 3 at 13-14. As a result, cameras are not placed in equidistant locations or successive streets in a particular locality. *Id.* Instead, they are placed strategically such that a person could travel between two locations and not come into view of any Flock cameras. *Id.* Similarly, sharing of images across jurisdictions is limited by laws and policies of each jurisdiction. Tr. 3 at 37-38.

Flock camera images are single image pictures and there is no ability for an investigator to stream images from the Flock cameras. Tr. 3 at 16. Further, Flock images are typically retained for only 30 days. Tr. 3 at 14-15.

## ARGUMENT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has "expanded our conception of the Amendment to protect certain expectations of privacy." *Carpenter v. United States*, 585 U.S. 296, 304 (2018). In *Carpenter*, the Court held that people have a reasonable expectation of privacy in the record of the totality of

---

[3]     As Mr. Michael Molina, Vice President and Deputy General Counsel, Flock Safety, testified, even if a Flock camera captured an image of a person who triggers the motion detection feature of the camera, an investigator would not be able to search for such a person. *See* Tr. 3 at 11-12.

their physical movements as captured by cell-site location information collected by mobile phone providers.  *Id.* at 310.

In *Leaders of a Beautiful Struggle v. Baltimore Police Department*, the plaintiffs sought a preliminary injunction against an aerial surveillance program that allowed law enforcement to track every outdoor movement of every person in Baltimore.  2 F.4th 330, 341 (4th Cir. 2021) (en banc).  The data collected by the surveillance program was retained for "at least" 45 days.  *Id.*  The Fourth Circuit applied *Carpenter*'s reasoning and held that the program's comprehensive and prolonged tracking violated reasonable expectations of privacy, and that law enforcement must obtain a warrant before accessing the resulting data.  *Id.* at 333.

Martin asks this Court to expand the reach of *Carpenter* and *Leaders of a Beautiful Struggle* to cover the police's use of the Flock database.  The Court should decline to do so.  There is no reasonable expectation of privacy in a car's license plate number or in partial information about the car's trips on public thoroughfares.  And Martin has failed to allege, let alone show, that Flock's cameras and the ALPR database allowed officers to track the totality of his movements.  Instead, the facts show that the police used the ALPR database to obtain a handful of pictures of the Acura on public roads.

But even if the Court agrees with Martin and finds that the use of the Flock database was a "search" under the Fourth Amendment, it should not suppress the resulting evidence.  The officers acted in good faith reliance on binding appellate precedent and valid search warrants.  The good-faith exception to the exclusionary rule therefore applies here.

## I.    No Fourth Amendment right has been infringed because Martin has not shown any legitimate expectation of privacy.

An unreasonable search within the meaning of the Fourth Amendment occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States*

*v. Jacobsen*, 466 U.S. 109, 113 (1984).  Martin bears the burden of showing, by a preponderance of the evidence, that he had such an expectation.  *United States v. Castellanos*, 716 F.3d 828, 832-33 (4th Cir. 2013).  This requires showing that he had a "subjective expectation of privacy," and that it was "an expectation that society is willing to recognize as reasonable."  *Id*. at 832; *see also United States v. Rose*, 3 F.4th 722, 727 (4th Cir. 2021).

Martin contends that he has a legitimate expectation of privacy because the Flock cameras have the capacity to track "the whole of his movements" anywhere in the United States.  Def.'s Supp. Mot at 7-8.  However, the evidence in this case undermines such a conclusion.  Further, even if he could show that he had such an expectation, it would not have been objectively reasonable.  Consider the three possibilities:  an expectation of privacy in (1) the Acura's license plate number, (2) the Acura's movements on public thoroughfares, or (3) the limited subset of Martin's movements captured by Flock cameras.

**A.  There is no reasonable expectation of privacy in a license plate number.**

The Flock database was used to identify the Acura's license plate number.  *See* Def. Mot. at 2.  There is no reasonable expectation of privacy with respect to a car's license plate number, which must, by law, be publicly displayed.  *See* Va. Code Ann. § 46.2-715; *New York v. Class*, 475 U.S. 106, 114 (1986) ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile"); *United States v. George*, 971 F.2d 1113, 1120 (4th Cir. 1992) ("[O]ne does not have a reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways").

Indeed, courts across the country have rejected the argument that collecting a license plate number without a warrant violates the Fourth Amendment.  *See, e.g.*, *Meeks v. McClung*, 2023

WL 8791686, at *7 (S.D. W.Va Dec. 19, 2023); *Becerra v. City of Albuquerque*, 2023 WL 7321633, at *2 (10th Cir. Nov. 7, 2023); *Chaney v. City of Albany*, 2019 WL 3857995, at *9 (S.D.N.Y. Aug. 16, 2019); *United States v. Miranda-Sotolongo*, 827 F.3d 663, 667-68 (7th Cir. 2016); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1151 (9th Cir. 2007); *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006).  This Court should do the same.

Further, the evidence in this case shows that the Flock cameras capture nothing more than could be captured by an eyewitness observing the vehicle on a public road.  The six parameters by which the images Flock stores are searchable include the same information which a witness would relay to a police officer taking a report at the scene of a crime, rather than information related to the registration of a vehicle, the address associated with a vehicle, or anything of that sort.  That certainly does not demonstrate that the Flock cameras have the capacity to "track" a vehicle in the same way that accessing phone data can show the step-by-step travel pattern and location of a person carrying that phone.

## B. There is no reasonable expectation of privacy in a car's movements on public thoroughfares.

The images of the Acura stored on Flock's database show the car on public roads.  For example, a picture of the car was taken at the intersection of Stella Road and Lamplighter Court.[4]

---

[4]    Martin previously alleged that the "Richmond Police Department has placed a Flock Camera directly at the entrance to the [Lamplighter Court] apartment complex to monitor, 24/7, anyone who leaves or arrives at the apartments."  Def. Mot. at 2.  In fact, the camera is at the intersection of two public roads, Stella Road and Lamplighter Court, and it cannot be used to "monitor, 24/7" the comings and goings from any of the Lamplighter Court apartments.  This is because residents of these apartments may exit either from Stella Road or from Lamplighter Drive. Tr. 1 at 39-41.

Moreover, using cameras to observe the outside of a residence does not violate the Fourth Amendment.  *See California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

There is no reasonable expectation of privacy in photographs of cars while they are on public roads.  As the Supreme Court has stated, "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  *United States v. Knotts*, 460 U.S. 276, 281 (1983).  Such movements are "voluntarily conveyed to anyone who wanted to look."  *Id.*; *see also Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) ("A car has little capacity for escaping public scrutiny," as "its occupants and its contents are in plain view" while on public roads); *George*, 971 F.2d at 1120.

    **C. Martin has not shown that Flock's cameras and ALPR database allowed officers to track the totality of his movements.**

        **1. The actual use of the Flock database here was far more limited than Martin's motion implies.**

Martin contends that the "networked Flock camera system captures a person's movements anytime they get in a car with the same ability to track that person's historical information as more cameras are added."  However, Martin ignores several important aspects of the testimony and evidence in this case.  First, as Sergeant Castrinos testified, there are several instances in his experience where an officer knows that a suspect is driving a vehicle and anticipates that the person would have captured a Flock camera, but no images are found with that vehicle.  Tr. 1 at 37-41.  Second, there is no evidence that a Flock camera can nor has the capacity to track any individual for any period of time.  The best that the cameras can do is show that a particular vehicle has passed a camera at a point-certain in time.  From there it may be able to depict that same vehicle passing another vehicle at another point-certain in time.  However, the cameras cannot show that a vehicle traveled a particular path from one point to another, nor show that the vehicle was operated by a particular driver.

Third, the facts show that Richmond and Chesterfield detectives used a handful of photos of the Acura for the limited purpose of identifying the car's license plate number.  These pictures

were taken on public roads and do not reveal the identity of or any personal details about the car's driver. For example, in United States Exhibit 4, these images show the car, its license plate, its distinctive window stickers, and little else. Martin does not allege that they show him driving the car, or that he had any expectation of privacy in the car's exterior at the time these pictures were taken.

Courts considering similar facts have regularly denied defendants' Fourth Amendment claims. For example, in *United States v. Rubin*, the government charged the defendant with Hobbs Act robbery and brandishing a firearm in furtherance of a crime of violence. 556 F. Supp. 3d 1123, 1124 (N.D. Cal. 2021). Surveillance footage from a Safeway showed the defendant stealing medications "while wielding a (possibly fake) firearm." *Id*. Shortly after the robbery, the footage showed the defendant entering a blue Jaguar that was parked near the store. *Id*.

Without a warrant, a police officer used an ALPR database to identify the Jaguar and its license plate. *Id*. at 1125. The officer determined that the defendant was the registered owner of the car, and then requested a warrant to place a GPS tracking device on the Jaguar for 30 days. *Id*. at 1125-26. The warrant was issued, and officers placed a tracker on the car. *Id*. at 1126. Five days later, the police obtained another warrant and searched the defendant's motel room. *Id*. There they found prescription medications, a bulletproof vest, and clothing matching the items in the surveillance video from the Safeway robbery. *Id*.

The defendant moved to suppress the fruits of the ALPR database search. *Id*. The court denied the motion, holding that accessing the database did not infringe upon any Fourth Amendment right. *Id*. at 1127. The court found that "there is no reason to believe that the database provided a detailed log of [the defendant's] movements," and it "revealed little more than where [the defendant] was probably living." *Id*. at 1129. It was therefore "clear that the information was

10

not remotely comparable to the 'detailed, encyclopedic' information at issue in *Carpenter*." *Id*. at 1130.  So too here.

Similarly, in *United States v. Porter*, the government charged the defendant with three counts of robbery and one count of brandishing a firearm.  2022 WL 124563, at *1 (N.D. Ill. Jan. 13, 2022).  A man robbed three banks.  *Id*.  Surveillance footage from one of the banks showed a man matching the description of the robber "exit[ing] a silver Ford Explorer with a large, white decal on the rear window and walk[ing] toward the [bank] immediately before the robbery.  A few minutes later, that man returned to the vehicle."  *Id*.  Without a warrant, officers used an ALPR database to identify the car and found that it was registered to the defendant.  *Id*.  The officers then obtained a warrant to install a GPS tracking device on the car.  *Id*.

The defendant moved to suppress "all evidence obtained from the license plate reader database search."  *Id*. at *2.  The court denied the motion.  *Id*. at *3.  It explained that use of the database did not infringe upon a reasonable expectation of privacy because "the database query response did not reveal intimate details of [the defendant's] daily life, nor did it track his every movement."  *Id*.  "Rather, the query produced limited images of [the defendant's] vehicle at public locations."  *Id*.

*Rubin* and *Porter* are not outliers.  *See, e.g.*, *United States v. Jiles*, 2024 WL 891956, at *16-19 (D. Neb. Feb. 29, 2024) (use of cameras and an ALPR database operated by Vigilant Solutions is not a "search" within the meaning of the Fourth Amendment); *United States v. Bowers*, 2021 WL 4775977, at *2-4 (W.D. Pa. Oct. 11, 2021) (contrasting information from an ALPR database with the cell phone data at issue in *Carpenter* and holding that using ALPR data does not violate the Fourth Amendment); *United States v. Brown*, 2021 WL 4963602 (N.D. Ill. Oct. 26,

2021).  Indeed, Martin does not cite, and the government has not located, any case holding that use of an ALPR database to identify a car's license plate number violates the Fourth Amendment.

### 2. Flock's cameras and ALPR database do not implicate the concerns raised in *Carpenter, Leaders of a Beautiful Struggle, nor Chatrie.*

Martin has not shown by a preponderance of the evidence, that law enforcement used Flock's cameras and database to access any private details about him or his movements.  That alone is fatal to Martin's motion, which must allege a Fourth Amendment violation and a "causal relationship" between the violation and the discovery of the evidence sought to be excluded. *United States v. Clark*, 891 F.2d 501, 505 (4th Cir. 1989); *see also Segura v. United States,* 468 U.S. 796, 815 (1984) ("[s]uppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity" (internal quotation marks omitted)).  But even if Martin could make such allegations, the Court should reject his effort to contort *Carpenter* and *Leaders of a Beautiful Struggle* to fit the facts here.

The holdings in those cases were narrow.  Both stand for the proposition that a reasonable privacy expectation is implicated when the government accesses data that can be used to track the *totality* of a person's movements over a sustained period of time.  *See Carpenter*, 585 U.S. at 315 ("[T]his is not a case about . . . a person's movement at a particular time.  It is about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years."); *Leaders of a Beautiful Struggle*, 2 F.4th at 344 (warrantless access of data from a system that "enable[s] police to glean insights from the whole of individuals' movements" invades a reasonable expectation of privacy).  And both cases emphasized the highly *personal* nature of the collected information.  *See Carpenter*, 585 U.S. at 311 (reasoning that "the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations" (internal

12

quotation marks omitted)); *Leaders of a Beautiful Struggle*, 2 F.4th at 342 (reasoning that the data "open[ed] 'an intimate window' into a person's associations and activities" (quoting *Carpenter*, 585 U.S. at 311)).

While Martin claims that the Flock cameras can track the totality of his movements, there is nothing in the evidence which shows that is the case. The testimony of Lars Daniel describe ALPR technology "in general." *See* ECF No. 16-1 at ¶¶13-30; 48-49. The declaration does not allege what, if any, of these technological features were used by or made available to the officers investigating Martin's case. In fact, Lars Daniel testified not only that he has "not seen many images from Flock. Period.", but he admitted that he did not know about the camera density in the Lamplighter Court area in Chesterfield County area, where the cameras in this case are located. Tr. 2 at 64-65. Moreover, Daniels also admitted that the Flock cameras are stationary cameras, not able to track the movements of any vehicle and are cameras which only capture details which would be observable to the naked eye. Tr. 2 at 60-70. Therefore, Martin has not shown that law enforcement used Flock's cameras and database to track his movements across multiple jurisdictions. As Daniel's declaration acknowledges, "Flock cameras do not include facial recognition capabilities," Flock only stores the pictures of cars for 30 days, and the hypothetical ability to track individuals as they move through different areas depends critically on the number and density of cameras in operation. *Id*. ¶¶ 39, 47-48. Speculation about potential future capabilities of Flock cameras does not entitle Martin to suppression of lawfully obtained evidence in this case. *Cf. Segura*, 468 U.S. at 816 (concluding that the warrantless entry of petitioners' apartment did not require suppression of evidence seized pursuant to a valid search warrant because it was "pure speculation" that "if the agents had not entered the apartment, petitioners might have arranged for the removal or destruction of the evidence").

13

Again, all of the information Flock cameras capture about a vehicle is publicly available, and there is no reasonable expectation of privacy in the exterior of an automobile. *George*, 971 F.2d at 1120. Indeed, it was the distinctive stickers on the Acura's passenger windows, plainly visible and captured by multiple local business security cameras, that led to Officer Redford identifying the car from among thousands of photographs.

It is true, as Martin contends, that officers used "high resolution Flock photographs" to identify the Acura's license plate number and to confirm that the car was on certain public roads at certain times. But Martin does not explain how the use of these photos is any different than using images from a pole or traffic-light camera. Use of such images without a warrant does not violate the Fourth Amendment. *See Leaders of a Beautiful Struggle*, 2 F.4th at 345 ("People understand that they may be filmed by security cameras on city streets"); *United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring) (short-term monitoring of "a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable"); *United States v. Vankesteren*, 553 F.3d 286, 290 (4th Cir. 2009) ("Videotaping of suspects in public places, such as banks, does not violate the [F]ourth [A]mendment; the police may record what they normally may view with the naked eye.").

Similarly, in United States v. Chatrie, 107 F.4th 319 (4th Cir. 2024) the Fourth Circuit considered whether the United States performed a search when it collected two hours of Location History data from Google. Id. at 330. The court found that it did not. Using the analysis from Carpenter, the Court, first considered the nature of the data collected by the United States, holding that the two hours of location data the United States collected

> "By no means was this an "all-encompassing record of [Chatrie's] whereabouts ... provid[ing] an intimate window into [his] person[al] life." *Carpenter*, 585 U.S. at 311, 138 S.Ct. 2206. All the government had was an "individual trip viewed in isolation," which, standing alone, was not enough to "enable[ ] deductions about

'what [Chatrie] does repeatedly, what he does not do, and what he does ensemble.' " *Beautiful Struggle*, 2 F.4th at 342 (quoting *Maynard*, 615 F.3d at 562–63). The information obtained was therefore far less revealing than that obtained in *Jones*, *Carpenter*, or *Beautiful Struggle* and more like the short-term public movements in *Knotts*, which the Court found were "voluntarily conveyed to anyone who wanted to look." *Carpenter*, 585 U.S. at 314, 138 S.Ct. 2206 (quoting *Knotts*, 460 U.S. at 281, 103 S.Ct. 1081). A record of a person's single, brief trip is no more revealing than his bank records or telephone call logs. *See Miller*, 425 U.S. at 442, 96 S.Ct. 1619; *Smith*, 442 U.S. at 742, 99 S.Ct. 2577. Chatrie thus did not have a "legitimate 'expectation of privacy,' " in the information obtained by the government, so the first rationale for the third-party doctrine applies here. *Carpenter*, 585 U.S. at 314, 138 S.Ct. 2206 (quoting *Miller*, 425 U.S. at 442, 96 S.Ct. 1619).

*Chatrie*, 107 F.4th at 330–31. There, as in this case, the United States only precured a few snapshots of the driver of the suspect vehicle over the course of a short period of time. Therefore, it di not reveal what he does "repeatedly, what he does not do, and what he does ensemble," and there is no evidence in the record to the contrary. And, as already established by the plethora of precedent that a defendant has no expectation of privacy in his license plate nor his movements on public thoroughfares, a defendant's movements in public are not " 'such a pervasive and insistent part of daily life' that [activating it] is indispensable to participation in modern society." *Chatrie*, 107 F.4th 319, 331 (quoting Carpenter, 585 U.S. at 315, 138 S.Ct. 2206 (quoting Riley, 573 U.S. at 385, 134 S.Ct. 2473)).

Courts have rejected similar attempts to shoehorn complaints about ordinary investigative methods into a *Carpenter*-style mosaic theory. For example, in *United States v. Tuggle*, police officers installed three video cameras on public property. 4 F.4th 505, 510 (7th Cir. 2021). They used these cameras to surveil the defendant's home for 18 months without a warrant. *Id*. The cameras "recorded around the clock," and the officers could "remotely zoom, pan, and tilt the cameras and review the camera footage in real time." *Id*. at 511. They could also review all of the footage later, as it was stored at an FBI field office.

15

The Seventh Circuit held that this "extensive pole camera surveillance" did not constitute a "search" under the Fourth Amendment. *Id*. The "government's use of a technology in public use, while occupying a place it was lawfully entitled to be, to observe plainly visible happenings" was permissible without a warrant. *Id*. Put another way, cameras do not "transform[] otherwise lawful visual surveillance into unconstitutional technological surveillance." *Id*. at 514.

The court also contrasted the use of camera footage with the cell phone data at issue in *Carpenter*. It explained that while stationary cameras in public locations can "capture[] an important sliver of [a defendant's] life," they do not "paint the type of exhaustive picture of his every movement that the Supreme Court has frowned upon." *Id*. at 524. Additionally, "[g]iven their immobile nature, the cameras could not make out an exhaustive record of the defendant's 'hitherto private routine.'" *Id*. at 524-525. *See also United States v. Hay*, 2024 WL 1163349, at *7-8 (10th Cir. Mar. 19, 2024) (warrantless surveillance for an extended period of time using pole cameras does not violate the Fourth Amendment); *Bowers*, 2021 WL 4775977, at *5 (contrasting the use of ALPR technology with the "all-encompassing and near-perfect surveillance" with which *Leaders of a Beautiful Struggle* and *Carpenter* were concerned); *Jiles*, 2024 WL 891956, at *19 (same); *United States v. Yang*, 958 F.3d 851, 862-64 (9th Cir. 2020) (Bea, J., concurring).

The court in *Tuggle* made another observation that applies here: "as society's uptake of a new technology waxes," "expectations of privacy in those technologies wane." 4 F.4th at 510. Thus, today "Americans largely accept" that "ever-watching fixed cameras will monitor their movements." *Id*. Indeed, in this case "ever-watching fixed cameras" owned and operated by local businesses comprehensively recorded the robberies, the attempted breaking and entering, and the use of the Acura to facilitate these criminal activities.

16

In sum, Martin has identified no reasonable expectation of privacy that could support a viable Fourth Amendment claim.  There is no expectation of privacy in a license plate number or in a car's movements on public thoroughfares.  And Martin has failed to show that law enforcement used Flock's cameras and ALPR database to track the totality of his movements.  For these reasons, the Court should deny his suppression motion.

## II.      The good-faith exception applies.

Even if the Court finds that use of the ALPR database was an unconstitutional "search," it should not suppress the evidence derived from that search.  The suppression of evidence is a remedy of "last resort" that is appropriate only when "the deterrence benefits of suppression" "outweigh its heavy costs."  *Davis v. United States*, 564 U.S. 229, 237 (2011).  Suppression is not warranted "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful."  *Id*. (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).  The officers involved here acted with an objectively reasonable good-faith belief in the lawfulness of their conduct.

The good-faith exception applies when officers conduct a search "in objectively reasonable reliance on binding appellate precedent."  *Id*. at 231.  The police accessed Flock's ALPR database in April and May of 2023.  Based on the binding appellate precedent at that time, a "reasonably well-trained officer" could not "have known that the search was illegal in light of all of the circumstances."  *United States v. Stephens*, 764 F.3d 327, 336 (4th Cir. 2014).

As discussed above, well-established case law supports the notion that "there can be no reasonable expectation of privacy in a vehicle's exterior."  *George*, 971 F.2d at 1119.  *See Knotts*, 460 U.S. at 281; *Cardwell*, 417 U.S. at 590.  Similarly, well-established case law supports the warrantless use of cameras on public property to observe happenings in public places.  *See Vankesteren*, 553 F.3d at 290-291; *Leaders of a Beautiful Struggle*, 2 F. 4th at 345; *Carpenter*, 585

U.S. at 316. Against this backdrop, and in the absence of any binding case holding that the use of an ALPR database to obtain a license plate number is a "search" under the Fourth Amendment, it was objectively reasonable for the officers to believe that they could use the database without a warrant. *See, e.g.*, *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (holding that the good-faith exception applied to cell-site location information collected without a warrant before *Carpenter*).

The good-faith exception also applies when officers gather evidence based on an objectively reasonable reliance on a search warrant that is subsequently invalidated. *Leon*, 468 U.S. at 922. This is because any "error in such case rests with the issuing magistrate, not the police officer, and punishing the errors of judges is not the office of the exclusionary rule." *Davis*, 564 U.S. at 239 (cleaned up). The evidence here was gathered after officers obtained multiple search warrants, and it was objectively reasonable for the officers to rely on these warrants. Martin has not alleged that any of the affidavits used to secure the warrants contained misleading information, and the facts do not support such an allegation. *See Franks v. Delaware*, 438 U.S. 154 (1978). Nor has Martin challenged the facial validity of the warrants or alleged that the affidavits were "so lacking in indicia of probable cause" as to render the issuance of the warrants relying on those affidavits "entirely unreasonable." *Leon*, 468 U.S. at 922.

"It is axiomatic that [c]ourts should not punish law enforcement officers who are on the frontiers of new technology simply because they are at the beginning of a learning curve and have not yet been apprised of the preferences of courts on novel questions." *United States v. Zelaya-Veliz*, 94 F.4th 321, 341 (4th Cir. 2024) (internal quotation marks omitted). Thus, even if the Court agrees with Martin, it should hold that the good-faith exception to the exclusionary rule applies, and it should therefore deny the suppression motion.

**CONCLUSION**

The government respectfully requests that the Court deny Martin's motion for the foregoing reasons.

Respectfully submitted,

Jessica D. Aber
United States Attorney


By: _____/s/_____
Stephen E. Anthony
Vetan Kapoor
Assistant U. S. Attorneys
Office of the U.S. Attorney
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
(804) 819-5400
(804) 771-2316 (fax)
Stephen.E.Anthony@usdoj.gov
Vetan.Kapoor@usdoj.gov


Date: August 28, 2024

19

**CERTIFICATE OF SERVICE**

I certify that on August 28, 2024, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By: _____/s/_____

Stephen E. Anthony
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Email: Stephen.E.Anthony@usdoj.gov

20